HAMLIN, Justice.
Railway Express Agency, Incorporated, (hereinafter referred to as Railway Express), alleging that it was engaged in express transportation business over the lines of railroads and via other means of transportation throughout the country in both interstate and intrastate commerce in each of the several states, petitioned the Louisiana Public Service Commission (hereinafter referred to as the Commission) during December, 1959, for the issuance of an order authorizing the closing of its offices at Algiers, Gretna, and Harvey, Louisiana,[1] and the consolidating of said offices with the New Orleans, Louisiana, general .agency, with the result that express traffic of said offices be handled through the company’s general agency at New Orleans by the extension of pickup and delivery service to those portions of the Cities of Gretna and Harvey (including Westwego and Marrero) which are served through separate offices at Gretna and Harvey, Louisiana.
After hearing before the Commission at regular session held at Gretna, Louisiana, on September 14, 1960, the case was held *521 open for additional testimony to be presented by the Jefferson Parish Council; although the Council was asked to advise the Commission whether it desired to submit such testimony, no reply was received. The Commission considered the matter as to final disposition on November 18, 1960; on November 29, 1960, it issued Order No. 8274, which recites in part:
“Testimony adduced is that for a period of twelve months ending August 31, 1960, at Gretna, Louisiana, the monthly averages were: 1083 shipments, $5,543.73 revenue, $689.94 expenses; at Harvey, Louisiana, 1150 shipments, $8,408.34 revenue, $983.96 expenses; at Algiers, Louisiana, for a period of twenty months ending August 31, 1960, the monthly averages were: 32 persons calling to receive shipments and 7 persons calling to forward shipments.
“Upon consideration of the matter it is the Commission’s opinion that the public convenience and necessity do not require the maintenance of the sub-station at Algiers, Louisiana, but do require the continuance of agency stations at both Gretna and Harvey, Louisiana, Accordingly, it is
“ORDERED, that the Railway Express Agency, Inc., be and it is hereby authorized to close their sub-station at Algiers, Louisiana, and it is further
“ORDERED, that the application to close the agency stations at Gretna and Harvey, Louisiana, be and it is hereby ' denied.”
Railway Express applied to the Nineteenth Judicial District Court for its review of Order No. 8274, praying that the court set aside the order, except insofar as it authorized the closure of plaintiff’s substation at Algiers, Louisiana. LSA-R.S. 45:1192. Plaintiff alleged that it was aggrieved and dissatisfied with Order No. 8274, and that same was contrary to fact- and law as well as arbitrary, except insofar as said order authorized the closing of its sub-station at Algiers, Louisiana. The Commission answered in the form of a general denial. New Orleans Traffic and Transportation Bureau, uniting with the Commission, intervened in the matter and prayed that the court sustain the validity of Order No. 8274. Plaintiff excepted to the petition of intervention, alleging that it failed to disclose a cause of action and failed to disclose a right of action or interest in New Orleans Traffic and Transportation Bureau.
The trial court stated that no hearing was requested on the peremptory exceptions filed to the petition of intervention, and that plaintiff, defendant, and intervener, had by joint stipulation submitted the matter to the court for its decision on the record. The court rejected plaintiff’s demands and dismissed its action, stating that it was in *523 agreement with the conclusion of the Commission that the public convenience and necessity required the continued operation of plaintiff’s offices at Gretna and Harvey.
Railway Express appealed to this Court, setting forth the following specification of errors:
“1. The District Court and the Commission erred in disregarding uncontradicted evidence relative to the historical evolution and emergency reorganization program of Railway-Express, in addition to changing conditions and local developments, necessitating the proposed consolidation
“2. The District Court and the Commission erred in failing to conclude that the public convenience and necessity require Railway Express to make the proposed consolidation.
“3. The District Court erred in failing to annul and set aside the Commission’s Order No. 8274 for the reason that in issuing it the Commission acted arbitrarily and unreasonably.
“4. The District Court and the Commission erred in basing their decisions upon legally inadmissible evidence.”
The trial court stated that plaintiff’s chief contention is that it is fighting for its life, so to speak, and that unless it is permitted to, effect consolidations as here sought it will not be able to continue in business. In its petition filed in the district court, plaintiff alleged that Order No. 8274 failed to reci ognize the importance of consolidation in Gretna and Harvey to the nationwide program of petitioner to effect drastic economies and thereby forestall liquidation.
A. D. Satterwhite,[2] General Manager of the Southern Division of plaintiff company, who lives in Atlanta, Georgia, testified that Railway Express was organized in 1928 at the insistence of the Federal Government, the first contract between the railroads and Railway Express being effective March, 1, 1929; that prior to 1929 (except during World War I),[3] this country’s express business was conducted by separate independent companies, including the Adams, Wells Fargo, and a number of others. By the agreement of 1929, Railway Express was to act as an agent for approximately three hundred owning railroads; under the agreement the Agency was to collect all of the revenues and pay the expenses, and the railroads were to take what was left over. Mr. Satterwhite said that Railway Express *525 was simply an agent of and for the railroads. The 1929 agreement continued until 1954 when a new agreement was executed; this new contract gave the railroads the privilege of withdrawal. Mr. Satterwhite stated that the provision was inserted in the contract because the earnings of the railroad were not sufficient; they were losing money; they felt that with the small package business as it was and the increasing wages and inflation, they might have to retire from the field. Mr. Satterwhite further stated that the outlook of Railway Express under the 1954 contract was not good; that the railroads had been suffering losses for quite some time, and they reached the point where they decided they couldn’t continue to subsidize the Agency.
Mr. Satterwhite testified that exhibits filed with the Interstate Commerce Commission would reflect that Railway Express suffered a deficit of around $16 million in 1955; $24 million to $24 and a half million in 1956; $33 million to $34 million in 1957; and $40 million in 1958. Mr. Satterwhite said that the deficits were subsidized by the railroads, and that in December, 1958, the New York Central Railroad gave notice of its intention to withdraw from the 1954 operating agreement.
Approximately three months after the withdrawal of the New York Central Railroad, Mr. William B. Johnson assumed the 'presidency of Railway Express; at that time (March 1, 1959) there was an approximate deficit of $38 million. With respect to the actions of the new president and the ensuing events, Mr. Satterwhite testified as follows:
“A. Well, when the new President took over he called in the top officers of the Company and explained the condition of our situation, and told them that with a normal set of books that we were hopelessly bankrupt and that it would be necessary, if we expected to' save the Company, it would be necessary that we take drastic action in making all economies possible. So, we got busy and made a lot of internal consolidations of departments like claim bureaus, district accounting bureaus and we consolidated offices, we retired a lot of people, we fired a lot of people and did everything that, we could to try to save the Company, and as a result of that we were able to reduce the deficit some $12 million to $13 million, as I recall.”
Under an emergency reorganization program, the Interstate Commerce Commission approved a Standard Express Operations Agreement, effective October 1, 1959 and ending December 31, 1973, between the “Rail Company” (approximately 176 railroad companies, including the Missouri Pacific and Texas and Pacific Railroads) and Railway Express. In its report of approv *527 al, the Interstate Commerce Commission stated:
“ * * * It is the applicants’ definite hope that the Agency may become a profit-making enterprise in every sense of the word, although the Agency’s president predicts that the profits ‘will no doubt be modest at first and will probably all be used for necessary capital expenditures for some time to come.’ This change in the Agency’s status is expected to bear fruit in a greater degree of cost-consciousness on the part of the Agency’s officials and employees for reasons explained by one witness in the following statement:
“ ‘The present accounting provisions provide the Agency with a blank check to pay its expenses, with the railroads’getting what is left over for line haul transportation. As a result, we discovered that many people, including some of the Agency’s own personnel, looked upon the difference’ between what the Agency collected from the public and its own costs as something akin to a profit.’
“The absence of opposition to the application lends weight to such expressions of shipper support as have come to our attention. We believe that the Agency occupies a useful place in the transportation of small shipments and that its continuance would be preferable to a substitute organization whose entry into the field might be attended with uncertainty and confusion.
* ‡ * * * *
“Although we are not primarily concerned with the organic structure of the Agency, we believe that the plan to enlarge its managerial responsibility should enable it to perform its functions more efficiently and enhance its usefulness in the transportation field.”
A similar agreement was negotiated between Railway Express and National Airlines and was consummated in 1959; it was filed with the Civil Aeronautics Board.
Under the new rail agreement, plaintiff is free to route traffic as it sees fit and free to make its own rates; it also controls pricing. The contract provided for a probationary period (expiring July 1, 1961) during which the plaintiff was to prove that it would be able to operate under the new contract at a profitable basis.
Mr. Satterwhite testified that under the emergency reorganization Railway Express was consolidating express agencies; his testimony is as follows:
“Q. What standard is applied in choosing consolidation points?
“A. Well, we use the standard of service and economy in determining the concentration point. Usually at an important railhead where we can bring *529 the traffic into that location and then distribute it from that location.
“Q. Was that standard applied in this application?
“A. Yes, sir, it was.
“Q. Does this application involve withdrawing service from the public?
“A. No, sir, it doesn’t. It does not.
“Q. What is its purpose?
“A. Its purpose is to give equal or improved service to the patrons in this area by making the pick-up and deliveries direct from New Orleans with our vehicles in that City.
^ *
“Q. Is consolidation purely a Louisiana or southern movement?
“A. No, sir, that is a nation-wide or system-wide plan and it is part of this overall program of economy to save this Company.
“Q. How many consolidations have been made or are pending?
“A. Well, we have already made several hundred and there are several hundred more pending or in the process of being made.
“Q. Is there any relation between this application and the National picture?
“A. This is a part of the National picture.
******
“Q. Do you make any distinction between closing an office and consolidating it ?
“A. Yes, we do.
“Q. What are they?
“A. When we close an office why we usually discontinue the service altogether and when we consolidate offices we continue to provide the service on an equal or better basis to the same areas.”
Mr. Satterwhite’s testimony with respect to the history of Railway Express and its present financial condition discloses that plaintiff sincerely believes that it will be benefited if the requested consolidation of the Harvey and Gretna Offices with the New Orleans Railway Express Terminal is granted.
Adam E. Stephens, who has been with Railway Express for eighteen years, is Superintendent for the Kentucky-Mississippi Division with headquarters in Memphis, Tennessee, and he is responsible for the service rendered, expenses, the welfare of employees, and the general conditions throughout his division; he testified with respect to present conditions at the Harvey and Gretna Offices and with respect to proposed changes under a consolidated plan; he affirmed the testimony of Mr. Satterwhite.
Mr. Stephens stated that at Gretna, Railway Express has facilities jointly with the *531 MP-TP Terminal Railroad and is represented by a joint agent with the MP-TP Railroad; that Railway Express has a contract agreement to perform pickup and delivery service in the area and that the joint agent is compensated separately.
With reference to Harvey, Mr. Stephens stated:
“At Plarvey again we have a joint agency arrangement with the MP-TP Railroad. Our representative is Mr. Fitzpatrick and our facilities are a part and parcel of the station and in addition to that we do own and maintain our own motor truck a salaried driver to perform pick-up and delivery service in the defined area of Harvey.”
Mr. Stephens stated that with the construction of the Huey P. Long Bridge across the Mississippi River, trains no longer serve Harvey and Gretna direct; that to expedite traffic, Railway Express instituted an over-the-road truck route to operate between New Orleans and Harvey and Gretna. With respect to the handling of shipments, he said, "* * * it added handling in that at the time the T.P. was serving Harvey and Gretna direct, that was fine. We unloaded the traffic to these stations and it was ultimately delivered to the consignee and the traffic picked up was brought to the station and loaded direct to the train. But with the re-routing of the T.P. Road and coming into New Orleans it necessitated an additional handling, both on the inbound and the outbound.”
Mr. Stephens further stated that the time element was affected because, of necessity and for economical reasons, only one truck was operated across the Mississippi River from New Orleans.
With respect to the effect the opening of the New Mississippi River Bridge in'the Greater New Orleans Area has had on the express business, Mr. Stephens gave the following testimony:
“Q. Now, where is the New Orleans General Agency located with respect to the eastern outlet of that bridge ?
“A. Well, leaving the bridge approach or exit at Dryades, we are at 1SS0 Julia Street, approximately 7 blocks from the exit of the new bridge.
“Q. Now, would you describe generally what proposed changes are to be made m Algiers, Gretna and Harvey?
“A. Well, as the service to the West Bank at this time is depending solely on the service afforded New Orleans we feel that we can give an equal to or even better service by' serving these points direct with the New Orleans trucks and drivers. Now, it must be remembered that all express traffic to and from the West Bank is routed to the New Orleans Terminal first. All *533 passenger' trains come into the one central location at the New Orleans Union Passenger Terminal where the traffic is unloaded to our express facility, where it is assorted and routed, and today that is considered as transfer traffic in the New Orleans Terminal.
“Now, after we unload these passenger trains and trucks and we make our assort and we load it again to a motor truck departing New Orleans approximately 9 a. m., Monday through Friday. Now, that truck comes to Gretna and dispatches to the station which is an additional handling and continues to Harvey and dispatches to that station.
“After the traffic is placed in the stations, of necessity, it must be processed. The traffic must be stripped of its bills, it must be priced and routed for either the drayman at Gretna or our chauffeur at Harvey to again load it on the truck and delivered to the consignee.
“Now, it is our purpose to eliminate that handling on the West Bank. We propose to process it in its entirety in the New Orleans Terminal, to sheet it and price it, charge it to our chauffeur, and let him depart from the New Orleans Terminal at about the same time, if not possibly an hour earlier, and come to the West Bank and immediately commence deliveries to our customers.
“Now, with that we have eliminated a handling and we have eliminated the potential claims. Each time we handle a shipment it is further subjecting the shipment to damage and a claim. That, primarily, takes care of the deliveries speaking of the inbound in the a. m.
“Now, the p. m. is concentrated generally on pick-up of outbound traffic. Right now the traffic is picked up by the chauffeur and contract draymen on the West Side and taken to the terminal, unloaded to the facility, and again loaded to our group account truck route and taken across the river to our convéyor where we assort it and load it to the outbound departing train.
“Now, with this proposal consummated our trucks would make pick-ups direct from the shipping public. Now, it would be billed, the bills applied to the shipment, and that truck would go direct to our terminal in New Orleans where the traffic would be routed and processed for departure on the same trains that it now leaves out on, but the handling has been eliminated to one handling.
* * * * * *
“Now, with the operation of some 50 trucks in New Orleans, I think it is understandable that we would have a greater flexibility of operation. We- *535 would gear the deliveries to the West Bank the same as we gear traffic to our Downtown New Orleans Area and that, primarily, is to have our trucks depart as early in the morning as we possibly can do.
íjí íjí # * ‡ %
“We feel that we can deliver the Downtown Area to the Downtown Merchants perishable goods decidedly or at a decidedly earlier hour than now prevails because of the time that we have eliminated in the handling and processing of traffic on the West Bank after it gets over here.
“Q. What is the condition of the Express Agency at New Orleans with respect to employees and facilities and equipment ?
“A. Well, we employ approximately 150 people in the New Orleans Terminal. We operate either 49 or 50 trucks today, a part of those being radio-equipped, and certainly we have employees of long experience and many of them are engaged in only one phase of our work, and in so doing they are well-versed in the Department in which they are working.
“Q. Will the employees and the facilities be able to handle satisfactorily the West Bank operations?
“A. There’s no doubt in my mind but what all matters pertaining to express can be handled equal to or eVen better than as now prevails.
* * * * * *
“Q. * * * What is the telephone situation in the areas involved in this consolidation ?
“A. Well, the telephone service is direct and there’s no toll charge between the West Bank and New Orleans, * * * we have a 10-trunk line keyboard which is an automatic board in the New Orleans Terminal and there would be direct dialing service, both in and out..
* * * * * *
“Q. * * * Now, if the consolidation is approved and the proposed method of operation to the key point at the New Orleans Terminal is put into effect, will there be any change in service at Harvey, Gretna and Algiers in the area served with regard to the number of days a week that the service is rendered?
“A. Yes, at the present time we have Monday through Friday service at the offices named. Now, in addition to the Monday through Friday, it should be pointed out that in rare instances do we deliver traffic on a Monday morning before 9 or 9:30 because of the handlings which have been previously pointed out.
*537 “With this proposal we plan and we will provide Monday through Saturday service, Saturday service, I should say, would be .to a limited extent in that we would deliver on Saturday traffic to those people that would desire such Saturday pick-up and delivery service.
.* * *
* * * * * *
ifA. * * * we will provide pickup and delivery service on air express ■each day of the week, including Sundays and Holidays.
“Q. You don’t provide that now?
“A. No, sir, we do not. The service on air express is dependent entirely ■on the over-the-road truck which operates from New Orleans in the a. m., and back in the p. m. There is no other service rendered on air express unless our customers on the West Bank bring it to our Terminal in New Orleans or to Moisant International Airport.”
Mr. Stephens further testified that under the proposed plan Railway Express would ■extend its service; that there would be extensions to Belle Chasse and the Naval Installation beyond Belle Chasse. He said that there was no intention to deprive anyone of service, and that claims would .be inore, efficiently handled through an adjuster.
No contention was made by Mr. Stephens that the Harvey and Gretna Offices were dosing money; he identified statements which showed that for the year ending August 31, 1960, the gross receipts at Gretna were $66,524.49, and the expenses were $8,279.26; he also identified an exhibit which showed that the gross receipts for the Harvey Office were $100,900.03, and the expenses were $11,807.47. Mr. Stephens further identified exhibits showing that an average of 7.1 persons per day called Feb. 23-March 4, 1960, to receive and forward shipments at Gretna; a daily average of 4 persons called at Harvey to receive shipments from Sept. 1 through Sept. 8, 1960; a daily average of 2 persons called to forward shipments at Harvey, Sept. 1-Sept. 8, 1960; at Harvey, an average of 7.3 persons called to receive and forward shipments Feb. 23-March 4, 1960; a daily average of 2 persons called to receive shipments at Gretna, Sept. 1-Sept. 8, 1960; a daily average of 1 person called to forward shipments at Gretna, Sept. 1-Sept. 8, 1960.
Mr. Stephens stated that if Railway Express were able to use the expenses that it had shown in its exhibits it would find a total in excess of $20,000.00 a year. He said that the consolidation would not save that amount, but that the consolidation would eliminate approximately $9,000.00 and save the customers a minimum rail charge of $2,26 assessed on Air Express Traffic.
As to toll charges over the New Mississippi River Bridge, Mr. Stephens said he *539 thought the charge was .35$ for a passenger car and .35$ per axle per truck each way. With respect to “pick-up”, he stated:
“No, we have not settled on it in fact but it probably would be on or near the railroad property because of the location of the two offices, but that has not been definitely decided. If and when that needs to be determined, I mean when it needs be determined, it would be so considered and so published that all interested parties would know well in advance where that truck would be located and the time that it would be spotted there.”
Mr. Stephens was asked what the relationship between the present application and the National picture is. He responded that the relationship was very closely tied because the proposed consolidation is only one such consolidation under way to bring about the needed' economies and only one phase of many alterations and changes that the company is undergoing in its transition. He said that Railway Express had 11,500 offices throughout the United States because of the operation in the old days up and down the railroad, but that there was presently a change all over the United States. He further stated, “This one application would have, actually, no' material bearing in itself on the outcome of Railway Express Agency as a whole, but’ this” multiplied by several hundred that have been consummated and the several other hundred that are now under consideration, collectively, will play and have a very decided effect on our future.” He said that it is necessary to have such a consolidation as the proposed one if Railway Express is to maintain its existence.
Opponents to the application filed by Railway Express offered the following testimony:
M. H. Jacobs, a representative of Avon-dale-Marine Ways, which is located on the West Bank of the Mississippi River, two miles above the Huey P. Long Bridge, testified that presently his company was out of the delivery limits of Railway Express and deliveries were brought to it by its Harvey Plant, which in turn had the packages delivered to it by Railway Express at Harvey. While testifying, Mr. Jacobs asked Mr. Stephens what the delivery service would be under the proposed consolidation plan inasmuch as his company was out of the delivery limits now, to which Mr. Stephens replied:
“Unfortunately, your firm is located both beyond the pick-up and delivery limits as constituted by the New Orleans area and the Harvey area, and for me to tell you now that we would' extend the limits with or without this, proposal being consummated would be hasty.
“I can tell you that there has been ' consideration given ' to extending the *541 New Orleans area in which your plant is located. In this interim period it would be to your advantage to do business with our representatives at Moisant which you have been doing for some time.”
Mr. Jacobs emphasized the fact that his company’s plant was across the river from Moisant Airport, and that his company desired to expeditiously handle its own problems, especially its Avoncraft Division with which Mr. Stephens was not familiar. Mr. Stephens replied:
“I would say this to you, sir: That whether or not this consolidation is brought about there is consideration now being given to providing P&D service to your installation and whether it be from Harvey or New Orleans, we realize your needs as they exist today and as they have existed. We are interested in providing the service from New Orleans because of the many shipments moving in Air Express service.”
Mr. Stephens further stated that it was hoped that the limits would be extended within forty-five days to Avondale-Marine Plant.
The following testimony ensued:
“Q. [BY MR. JACOBS:] Well, I’ll ask you this: when do you think you will deliver to our plant? Roughly, if you have Harvey and Gretna and outlying points. You know we are the most outlying point of all. at Avon-dale. When will our deliveries be effected ?
“A. [BY MR. STEPHENS:] Your deliveries would probably be effected somewhere between 10:30 and 11 o’clock in the morning. That would be your delivery time.
“BY MR. JACOBS: That’s áll thé questions I háve.” : • '
James P. Pitts, Chairman, of the West Bank Council of the Chamber ,of Commerce, testified to the tremendous housing growth on the West Bank'of the Mississippi River, stating that Jefferson Parish had a population of 207,000 of which 80,000 wére on the West Bank. He testified that the West Bank Council of the Chamber of Commerce was opposed to the granting of the application and desired that pickup' and delivery service be extended to the Ororiite Chemical Plant which is south of Alvin Callender Field.
Robert E. Throckmorton, Office Manager of the Red Star Yeast Plant at Belle Chasse, Louisiana, (close to the end of the line) stated that because his company manufactured a perishable product (dry yeast) it was interested in prompt service, and that therefore his company had been delivering to Railway Express at Gretna; that on occasions when he had been low on personnel he delivered packages to the H ew *543 Orleans Railway Express Terminal. He criticized the New Orleans service, stating that it was neither prompt nor adequate; this was denied by Mr. Stephens. Mr. Throckmorton questioned Mr. Stephens with respect to the proposed consolidation as it would affect a perishable product and received the following answer:
“I can readily understand how you’ve experienced that and I feel that way today. You are dealing in a highly perishable item and we would treat your yeast—we do it the same as we would seafood or fresh meat.
“Now, to expedite the pick up and delivery of perishable items we need to not consider them or treat them as we would a customer handling dry traffic, one delivery in the a. m., or attempt to, or one in the p. m. delivery. To obviate that condition our trucks to be operated on the West Bank of the River will be equipped with radios with the Central Dispatcher at the New Orleans Terminal, and he will be in touch with him at all times.
“Now, if he has been to your place of business and departed and you receive a teletype that driver will again return to your place of business to pick up the shipment and move it that night.”
Alvin J. Fitzpatrick, Local Agent of the Railway Express at Harvey, and J. R. Generes, Joint Agent for the TP-MP Terminal and Railway Express, testified with respect to exhibits showing the number of shipments brought to and picked up from the Harvey and Gretna Offices. For the period' January through August, 1960, 991 shipments were picked up from the Harvey Office and 827 were brought in—1828 shipments in eight months for an average of approximately 23 shipments per day; for the Gretna Office 642 shipments were picked up—an average of 8 shipments per day. The agents also testified as to business, analysis which were not greatly dissimilar to those to which Mr. Stephens testified.
Arthur S. Graham, Director of Research and Statistics Division of the Chamber of Commerce of the New Orleans Area, testified over the opposition of counsel for Railway Express as to the great economic growth and business activity of the West Bank for the last nineteen years (1940— 1959). His testimony reflected a tremendous population growth, an increase of electric consumption, an increase in telephone service, an increase in employment,, and an increase in retail sales and buying income.
At the beginning of the hearing before the Commission, the following persons appeared and made statements before the taking of testimony as to their opposition' to the proposed consolidation; they were not under oath and were not subjected to cross or direct examination.
*545 Byron Tynes, President of the Downtown Gretna Business Association, which has a membership of twenty-eight merchants, stated that his association was unanimously opposed to the closure of the Gretna and Harvey Offices, because the members felt that they would have further delays in services and deliveries; that they feared additional expense because of the pick up of merchandise; that they also feared that delivery would be slow, and that going across the Mississippi River would involve the expenditure of additional time.
Mayor Bill White of Gretna stated:
“First of all, these express offices in Gretna and on the west bank, I not only represent the City of Gretna, but I practice law and let’s say being Mayor is a part-time job. I practice law and am well established and I am well known and I know the pulse of the west bank, so to speak.
“The West Bank needs these offices here in my opinion. They certainly have better service and if anything is changed it will be that they are paying more for less service, and I don’t think that’s fair. .
“I’ll admit that we have a great metropolitan area here but that doesn’t mean that everything can be amalgamated. Sometimes by autonomy, by separate divisions, you can have more efficiency and we all know that. There are Banks that branch out and other establishments like your commercial establishments down on Canal Street that branch out.
“We can do better by having diversified operations; having offices in various sections and I think that that is the economic approach, and I think that the merchants here are all unanimous in opposing this application because they feel they are getting good service now at a reasonable cost and if any change is made it will cost them more and they will get less service.”
H. J. McMaster, Regional Traffic Manager of the Wesson Oil Division of Hunt Foods, Gretna, stated that his company used the express facilities regularly and would like very much to see them continued as they were.
M. C. Budge, Traffic Manager, JohnsManville Products Corporation, Marrero, stated that his company would like to have the local express service continued; that one of the reasons was that if it were discontinued, there might be added expense in draying shipments to New Orleans. He said that the personalized service rendered by Railway Express was appreciated and there was fear that it might not be continued.
Robert Stolf, Office Manager of Gretna Machine & Iron Works, reiterated the *547 statements of the previous parties. With respect to the consolidation, he said that he feared additional expense in time and money in having , to cross the Mississippi River if the local Railway Express offices were closed.
Anthony A. Caramonte, Councilman for the Second District of the West Bank, appeared as a representative of the Parish Council and on his own behalf. He stated that the rapid growth of the West Bank and the lack of land on the East Bank necessitated that the Railway Express offices remain open in Gretna' and Harvey.
W. J. Rupp, a representative of Oronite Chemical Company, Belle Chasse, Louisiana, requested that the agencies be continued for reasons of economics and service.
Mrs. lone Calzada, owner of a small flower shop on the West Bank, stated that she needed the local service; that her flowers had to be received and put into water in ai certain length of time. She said that the proposed change would cause her to travel around and get bad flowers that she could not use.
Donald E. Bone, General Manager of Wilson’s Variety Stores, Gretna, who appeared as a representative of the West Bank Rotary Club which is composed of approximately fifty-one members, all business and .professional people of the West Bank, stated that he and the members of the Rotary Club were opposed to the proposed change for the same reasons stated by the other parties and for reasons expressed in a letter to the Commission.
The foregoing testimony has been set out in lengthy detail because we believe that it is the most important factor in the decision of this case. Article VII, Section 10, of the Louisiana Constitution of 1921, LSA, vests this Court with appellate jurisdiction of the present matter and extends our jurisdiction to both the law and the facts. “Hence it is not only the right, but the duty, of this court to determine whether the order complained of was justified by the facts of the case. This court is bound to interfere when it finds that the judgment appealed from is clearly wrong on the evidence. * * * ” Vicksburg, S. & P. Ry. Co. v. Railroad Commission of Louisiana, 132 La. 193, 61 So. 199, 201. See, Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, 239 La. 175, 118 So.2d 372, 377; Texas & N. O. R. R. Co. v. Louisiana Public Service Commission, 241 La. 635, 130 So.2d 398.
The Commission and its members, appellees, agree with the foregoing statement but contend that the application of the' following law, with respect to agency discontinuances, to the facts of - the .instant case justifies the Commission’s Order No. 8274:..... ... .
*549 “ ‘Whether or not á railroad may properly be entitled to discontinue an agency at a station generally depends upon the facts of the particular case and ordinarily the test employed in determining the matter, where an absolutely necessary service is not involved, is whether the public good derived from maintenance of the agency station outweighs the expense to the railroad in continuing such agency.’ * * * ‘The circumstances to be taken into consideration are the volume of business done at the station, its. proximity to other stations, the accessibility thereof, the cost of maintaining • such agency station, the financial loss, if any, to the railroad company, due regard for the. welfare of the public, and the probabilities of future development. * * * Broadly speaking, the railroad is under no duty to provide an agent at a station where the volume of business is not sufficient reasonably to demand the services of such an employee, * * * and in connection with an application for discontinuance it is unreasonable to require the maintenance of an agency station where the cost of the service is out of proportion to the revenue derived from the portion of the public benefited thereby, .particularly-where a substitute service may be provided affording the same essential, although less convenient, service.’” Texas & New Orleans Railroad Co. v. Louisiana Public Service Commission, 235 La. 973, 106 So. 2d 438 ; 74 C.J.S. Railroads § 402, p. 962.
The testimony of the officials of the plaintiff company discloses that Railway Express is definitely fighting for its existence. It is operating under the 1959 agreement, supra, which imposes on it the burdens of emergency reorganization and the making of a nationwide profit. Plaintiff is no longer an unconcerned agent strictly dependent upon its principal; Mr. Satterwhite’s testimony is a cry for relief to help decrease an overall deficit of approximately $38 million in 1959. Mr. Stephens’s detailed and lengthy testimony repeatedly states that the proposed consolidation will not affect the services rendered to Railway Express customers in the Gretna and Harvey areas. The testimony describes the advantages of a centralized and consolidated plan of service with continued pickup and delivery service; it reflects that there will be adequate telephone service without toll, some radio operated trucks, and an extension of boundaries served in the New Orleans area.
The testimony of opposing witnesses and the statements of persons who appeared at the beginning of the hearing before the Commission in opposition to the proposed consolidation were expressive of fear. *551 These persons represented one of the largest expanding communities in the United States, and their testimony and statements were to the effect that their community deserved the best in express service; they feared that there would' be increased expenditure of time; they disliked the loss of the personalized service they had been receiving; some expressed fear of increased costs in shipments. Nowhere in their testimony or statements did they prove that they would have to go to Railway Express in New Orleans instead of having Railway Express come to them; they hypothesized loss on perishable products but did not prove that the time factor would be the direct cause.
Counsel for plaintiff alleges that this is the first case to reach the courts of this State involving the right of Railway Express to consolidate agencies and thereby modernize, economize, and render better service.[4] We believe, however, that the numerous railroad closing cases which this Court has adjudicated set forth the proper-principles of law to apply to the instant matter.
In Texas & New Orleans R. Co. v. Louisiana Public Service Commission, 233 La. 787, 98 So.2d 189, we held:
“Applicable to the cause, and about which there appears to be no dispute, are the following legal pronouncements :
*553 “ ‘ * * * it is well settled that the orders of the Public Service Commission, like those of other administrative bodies acting under a delegation of discretionary authority, should be accorded great weight and will not be overturned by the courts in the absence • of a clear showing of abuse of power. .* * * ’ Illinois Central Ry. Co. v. Louisiana Public Service Commission, 224 La. 279, 69 So.2d 43, 47. ‘A board •or commission in deciding what train service shall be provided by a railroad •must be guided in its determination by the public convenience and necessity in relation to such service; and where ■it is sought to discontinue certain service, the controlling criteria are the ■character and population of the territory served, public patronage or lack ■thereof, the remaining transportation facilities, the expense of operation as ■compared with revenue therefrom, and ■the financial condition of the railroad •as a whole.’ 74 C.J.S. Railroads § 418b (3). * * *” See, Missouri Pacific Railroad Company v. Louisiana Public Service Commission, 241 La. 242, 128 So.2d 644.
“ * * * In determining whether •a railroad is entitled to close an agency •station, the issue is not whether the •station has been operated as efficiently •as it should have been or whether it •would do better if certain improvements were made or a particular service restored but, as we have above stated, whether the public good derived from maintenance of the agency outweighs the expense to the railroad in continuing such agency. * * * ” Illinois Central R. Co. v. Louisiana Public Service Commission, 241 La. 1, 127 So.2d 178. See, also, Texas & Pacific Railway Company v. Louisiana Public Service Commission, 240 La. 669, 124 So.2d 902.
“The rule in regard to discontinuance of an agency station is a determination of the public convenience and necessity in relation to such service and the expense of the operation as compared with the revenue therefrom. The circumstances which should be considered are the volume of business done at the station, its proximity to other stations, the accessibility thereof, the cost of maintaining such agency station, the financial loss, if any, to the railroad company, due regatd for the welfare of the public, and the probabilities of future development. * * ” Illinois Central Railroad Co. v. Louisiana Public Service Commission, et al., 240 La. 769, 125 So.2d 159. See, Texas & New Orleans Railroad Company v. Louisiana Public Service Commission, et al., 241 La. 635, 130 So.2d 398; 74 C.J.S. Railroads § 402, p. 962.
*555 In a large number of cases, the determining factor has been whether the public good derived from the maintenance of the agency outweighed the expense to the railroád in continuing such agency. Financial results of the operation involved, however, have been secondary to the public convenience and necessity.[5] The profit or loss of a station has not been the sole determining factor in ascertaining whether or not the station should be closed. Missouri Pacific Railroad Company v. Louisiana Public Service Commission, 241 La. 242, 128 So.2d 644. See, Morgan’s Louisiana & T. R. & S. S. Co. v. Railroad Commission of Louisiana, 127 La. 636, 53 So. 890; Louisiana Ry. & Navigation Co. v. Railroad Commission of Louisiana, 131 La. 387, 59 So. 820.
The following statements'made with reference to railroads are also applicable to an agency such as Railway Express:
“ * * * The state will not, however, undertake to compel the railroad company to transact its whole business at a loss, for that would be to violate the Constitution of the United States; nor will the courts of the state undertake to compel such company to transact any part of its business upon unreasonable terms, merely that particular persons, whether incorporated or not, may profit thereby, for that would be to violate the Constitution of the state; and, perhaps, of the United States as well.” Louisiana Ry. & Navigation Co. v. Railroad Commission of Louisiana, 131 La. 387, 59 So. 820.
“ * * * We assume that a business, as large as the railroad corporation is. operated by competent men experienced in that field. When we throttle- and stifle their operations to the extent that we force them to maintain economic losses through the operation of certain stations, we must look for the-necessity and inconvenience occasioned the people using the station and weigh this against the losses in service and efficiency to the majority, which logically results from this drain on revenues. To force the railroad to continue losing operations which, from the-evidence, show a steady decline over a period of years will inevitably result in bankruptcy for the railroad company and assumption of management by the Federal Government or in decreased and less efficient service, maintenance and equipment.” Illinois Central R. Co. v. Louisiana Public Service Commission, 240 La. 769, 125 So.2d 159.
*557 See, also, Richland Gas Co. v. Hale, 169 La. 300, 125 So. 130.
Applying the foregoing law to the facts, supra, and to our summarization of said facts, supra, we find that plaintiff bore its burden of proving that the public convenience and necessity would not be materially affected if its offices in Gretna and Harvey were closed and consolidated with the New •Orleans general agency.
The Louisiana Public Service •Commission is a constitutional body, deriving its authority from Section 4 of Article VI of the Constitution of 1921. See, also, LSA-R.S. 45:1165. Its rulings are not .overturned in the absence of a clear showing of abuse of power. S. A. Harris Transfer & Storage, Inc., et al. v. Louisiana Public Service Commission et al., 240 La. 1059, 127 So.2d 148; Texas & New Orleans Railroad Co. v. Louisiana Public Service Commission, 241 La. 635, 130 So.2d 398. However, where the findings and conclusions of the Commission do not conform to the law and are not supported by the evidence—so that the order of the Commission.is unreasonable—the court may reverse or vacate the Commission’s order. Texas & New Orleans Railroad Company v. Louisiana Public Service Commission et al., 235 La. 973, 106 So.2d 438; Herrin Transportation Company et al. v. Louisiana Public Service Commission et al., 241 La. 174, 127 So.2d 541.
We conclude that the evidence of record does not support the conclusion of the • Commission with respect to plaintiff’s Harvey and Gretna Offices; we find that Order No. 8274 of the Commission is unreasonable insofar as it pertains to these offices and must be vacated and set aside in this respect.
For the reasons assigned, the judgment of the district court is reversed and set aside; it is now ordered that Order No. 8274 of the Louisiana Public Service Commission be annulled, set aside, and vacated insofar as it denied plaintiff’s application to close its agency stations at Gretna and Harvey, Louisiana, and consolidate them with its New Orleans, Louisiana, general agency. Appellees to pay only those costs for which it is liable under the provisions of LSA-R.S. 13:4521.
HAMITER, J., dissents with written reasons.

. Algiers, Gretna, and Harvey, Louisiana, are located on the west bank of the Mississippi River. . The New Orleans, Louisiana, general terminal or agency of Railway Express is located on the east bank of the Mississippi River, approximately seven blocks from the exit of the New Mississippi River Bridge.

. Mr. Satterwhite’s testimony is uncontradicted.

. “Q. Was the Federal Government in- •• strumental in the organization of the Company after the War?
“A. Yes, you know during the war period the Director General was appointed to direct the express operations, and they had the experience of a one-company operation during that period, and with that experience the Government felt that the public would be better served to have one express agency—one Express Company.” ........ •.....■

. In Public Utilities Reports, Third Series, Annual 1960, Sec. 253, p. 326, we find the following annotations from other States:
“(Cal.) A railway express agency was granted permission to close offices serving certain termini, to provide collection and delivery of express shipments by motor trucks operated between a city and certain termini, and to change the way-billing of shipments from the offices closed to a central office, thereby increasing certain intrastate charges upon a showing that revenues had declined substantially and ■ that it was necessary to modernize the system. Re Railway Express Agency, Decision No. 599927, Application No. 41694, April 12, 1960.
“(Cal.) A railroad express agency was granted permission to discontinue 11 offices and consolidate the services available from the discontinued offices by extending the pickup and delivery limits from 2 other offices, where the evidence showed that the discontinuance was in the public interest since it would improve service and reduce operating costs. Re Railway Express Agency, Decision No. 60S90, Application No. 42528, Oct. 18, 1960.
“(N. J.) A railroad express company was granted permission to close certain offices on condition that express pickup and delivery service to the affected cities would be furnished from a nearby office. Re- Railway Express Agency, Docket No. 601-48, April 5, 1960.
“(N. J.) Several railway express commission agencies operating at a profit in towns near a key city agency were permitted to be discontinued on the condition that express pickup and delivery service be provided from the key point, where the change was a part of the agency’s reorganization program to.eliminate overall operating deficits. Re Railway Express Agency, Docket No. 608-563, Oct. 21, 1960.”
See Connecticut case cited by counsel for plaintiff in brief, Docket No. 9824, Conn.Pub.Util.Comm., 1960.

. “The commission is required, in cases involving discontinuance of railroad express agency service, to give primary consideration'to public convenience and necessity and to treat the financial results of the operation involved as matters for secondary consideration. Re Railway Express Agency, Docket No. 612-88, April 6, 1961.” 38 Public-Utilities Rep., Third Series, Sec. 253, N.J., p. 586.